## UNITED STATES DISTRICT COURT
## FOR DISTRICT OF MINNESOTA

|  |  |
|---|---|
| Linda Gonzales and Michelle Streich, individually, and on behalf of those similarly situated, | Case No. 24-cv-3651 |
| Plaintiffs, | **COMPLAINT - CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| Allina Health System, | |
| Defendant. | |

Plaintiffs Linda Gonzales and Michelle Streich ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, by and through their attorneys of record, assert the following against Defendant Allina Health System ("Allina Health" or "Defendant").

## <u>INTRODUCTION</u>

1.     This class action lawsuit arises out of Allina Health's unlawful use of third-party tracking technologies by data brokers such as Meta and Google LLC (the "Tracking Tools") to surreptitiously intercept and disclose its patients' private and protected communications, including communications concerning highly sensitive personal health information, to third parties without patients' knowledge or consent.

2.     By purposely embedding and deploying the Tracking Tools on Allina Health's web properties, Allina Health engages in the unauthorized disclosure of its patients' highly sensitive Protected Health Information ("PHI") and Personally Identifiable

Information ("PII") to third parties including, but not limited to, Meta Platforms, Inc. d/b/a/ Meta ("Facebook") and Google LLC ("Google").[1] Such disclosures of PHI and PII violate state and federal law.

3.      Allina Health is a nonprofit corporation headquartered in Minnesota "dedicated to the prevention and treatment of illness and enhancing the great health" of its patients.[2] Allina Health has over 28,000 employees and 6,000 associated and employed physicians.[3]

4.      Allina Health encourages patients and prospective patients to use its website, available at https://www.allinahealth.org/ (the "Website") and its patient portal, available at https://account.allinahealth.org/dashboard (the "Portal"), to communicate about symptoms and conditions, research treatments, lookup physicians, schedule appointments, pay their bills, among other activities.[4]

5.      Unbeknownst to its patients and prospective patients, their communications were intercepted and disclosed to third parties through Allina Health's use of Tracking Tools, third party trackers from companies including Facebook and Google.

---

[1] While this complaint focuses on tracking tools from Facebook and Google, research shows that Defendant also embedded tracking codes from a number of other marketing companies including Bing (Microsoft) and Pinterest, which are also capable of collecting personal health information and linking it to a specific individual.

[2] *See* https://www.allinahealth.org/about-us

[3] *Id.*

[4] Without the benefit of discovery, Plaintiffs do not have the evidence that Allina installed third-party trackers on its Patient Portal; however, given that Defendant did choose to embed third-party tracking codes on the log-in and sing up pages for the Portal, as well as on the bill pay webpages, upon information and good faith belief Plaintiffs allege that Allina installed such trackers in the Portal as well.

6.      One of the Tracking Tools Allina Health deployed on its Website is the Meta Pixel ("Pixel").[5] The Pixel is a snippet of code that, when embedded on a website, tracks the website visitor's activity on that website and sends that data to a third party, like Meta.

7.      The Pixel tracks and logs the pages a website user visits during a website session that reveals their patient status and other PII and PHI, searches, and other submissions to the website. Indeed, the Pixel is routinely used to target specific individuals by utilizing the data gathered through the Pixel to build profiles for the purpose of future targeting and marketing.

8.      The information Allina Health transmitted to third parties, such as Meta, without Plaintiffs' consent included PHI,[6] which is some of the most personal and sensitive data Plaintiffs have.

9.      Additionally, when a patient communicates with Allina Health's Web Properties where the Pixel is present, Pixel source code causes the exact content of the

---

[5] Meta also provides other tracking technologies that give the same or similar tracking functionalities as the Pixel including, but not limited to, Conversions API, SDKs, and Audiences. Absent discovery, Plaintiffs are unable to independently confirm whether Defendant installed such tracking technologies on its Website.

[6] Under HIPAA, "health information" is defined as "any information[], whether oral or recorded in any form or medium, that . . . [i]s created or received by a health care provider . . . and [r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." 45 C.F.R. § 160.103. Additionally, HIPAA defines "health care" as "care, services, or supplies related to the health of an individual" and includes, but is not limited to, the "[s]ale or dispensing of drug, device, equipment, or other item in accordance with a prescription." *Id.*

patients' communications with the Website to be re-directed to Meta in a way that identifies the person as a patient.

10.     Here, Plaintiffs used the Website to communicate about their sensitive health conditions and symptoms, research potential treatments and physicians, and make appointments. Unbeknownst to Plaintiffs, when they communicated about their PHI, the Pixel secretly intercepted, recorded, and transmitted those private communications to Meta along with unique identifiers Meta could use to identify Plaintiffs.

11.     As a result of Defendant's use of the Pixel, Plaintiffs' and Class Members' PHI and PII including, but not limited to, computer IP addresses, patient status, health conditions and symptoms, treatments, physicians, appointment details, and unique personal identifiers used to link the sensitive web communications to Plaintiffs and Class Members, were compromised and disclosed to third parties such as Meta without authorization or consent.

12.     Such private information allows Meta to know that a specific patient was seeking confidential health care or exploring treatment for a specific condition.

13.     Defendant's Tracking Tools have also transmitted patients' PHI and PII to additional unauthorized third parties for marketing and advertising purposes, including Google.

14.     Google's tracking technologies operate much like the Meta Pixel. As one District Court recently described:

> Whenever a user visits a website that is running Google Analytics, Ad Manager, or some similar Google service, Google's software directs the user's browser to send a separate communication to Google. This happens

even when users are in private browsing mode, unbeknownst to website developers or the users themselves. The operation is not in dispute. When a user visits a website, the user's browser sends a "GET" request to the website to retrieve it. This GET request contains the following information: the Request URL, or the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site. At the same time, the user's browser reads Google's code, which is embedded on the website. Google's code instructs the user's browser to send a second and concurrent transmission directly to Google. This second transmission tells Google exactly what a user's browser communicated to the website.[7]

15.     In secretly deploying the Tracking Tools on its Website to intercept and disclose website communications concerning its patients' and prospective patients' PHI and PII, Defendant acted with a tortious and criminal purpose in violation of state and federal laws.

16.     Plaintiffs and Class Members never consented to, authorized, or otherwise agreed to allow Defendant to disclose their PHI and PII to anyone other than those reasonably believed to be part of Allina Health, acting in some healthcare-related capacity. Despite this, Defendant knowingly and intentionally disclosed Plaintiffs' and Class Members' PHI and PII to Meta, Google, and other third parties.

---

[7] *Brown v. Google LLC*, No. 4:20-CV-3664-YGR, 2023 WL 5029899, at *2 (N.D. Cal. Aug. 7, 2023). As explained by the Court in *Brown*, Google connects user data to IP addresses; IP addresses have been classified by the United States Department of Health and Human Services ("HHS") as personally identifiable information that constitutes one of the 18 HIPAA identifiers of PHI. *See* 45 C.F.R. § 164.514 (2).

17.     Given the nature of Meta and Google's businesses as two of the world's largest online advertising companies, Plaintiffs' and Class Members' PHI and PII can and will likely be further used by or exposed to additional third parties.

18.     As a direct and proximate result of Defendant's unauthorized exposure of Plaintiffs' and Class Members' PHI and PII, Plaintiffs and Class Members have suffered injury, including an invasion of privacy, loss of the benefit of the bargain Plaintiffs and Class Members considered at the time they bargained for healthcare services and agreed to use Defendant's Website for services, statutory damages, and the continued and ongoing risk to their PHI and PII.

19.     Plaintiffs bring this action individually, and on behalf of a Class of similarly situated individuals, to recover for harms suffered and assert the following claims: (i) Violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511; (ii) the Minnesota Protection of Communications Act ("MPCA"); (iii) Invasion of Privacy; (iv) Negligence; (v) Breach of Implied Contract; (vi) Unjust Enrichment; (vii) the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA"), Mn. Stat. §325D.43-48; (viii) the Minnesota Consumer Fraud Act ("MCFA"); and (ix) the Minnesota Health Records Act ("MHRA").

## PARTIES

20.     Plaintiff Linda Gonzales is, and at all relevant times was a resident of Maplewood, Ramsey County in Minnesota.

21.     Plaintiff Michelle Streich is, and at all relevant times was a resident of Howard Lake, Wright County in Minnesota.

22.     Defendant Allina Health System is a Minnesota nonprofit corporation headquartered at 2925 Chicago Avenue in Minneapolis, Minnesota 55407.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under federal law, including ECPA, 18 U.S.C. § 2511, *et seq*.

24.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over Defendant because Allina Health is a Minnesota nonprofit corporation with its principal place of business in this District.

26.     Venue is proper under 28 U.S.C. §§ 1391(b)(1)-(2) because Defendant's principal place of business is in this District and a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.     Federal Regulators Have Warned Healthcare Providers About the Impermissible Use of Tracking Technologies.**

27.     The surreptitious collection and disclosure of PHI and PII is a serious data security and privacy issue. Both the Federal Trade Commission ("FTC") and HHS have reiterated the necessity for data security and privacy concerning health information.

28.     The FTC published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. Rather, it is anything that conveys information—or enables an inference—about a consumer's health. Indeed,

[recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information."[8]

29.     The FTC informs companies that provide healthcare services that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.** In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out. [Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[9]

30.     HHS affirmed that HIPAA and its regulations prohibit the transmission of individually identifiable health information ("IIHI") by tracking technology like the

---

[8] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

[9] *Id.* (emphasis added).

Google and Meta without the patient's authorization and other protections like a business associate agreement with the recipient of patient data.[10]

31.     In July 2023, the FTC and HHS sent a letter to approximately 130 healthcare providers warning them about the use of online tracking technologies that could result in unauthorized disclosures of PHI to third parties.[11] The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others."[12] According to the letter, "[s]uch

---

[10] *See* Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (noting that "IIHI collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services."). This guidance was recently vacated in part due to the court finding it in part to be the product of improper rulemaking, and it is cited for reference only until OCR updates its guidance, should it do so in the future. *See American Hosp. Ass'n v. Becerra*, 2024 WL 3075865 (S.D. Tex., Jun. 20, 2024). The Court's Order found only that OCR's guidance regarding covered entities' collection and disclosure to third parties of users' IP addresses while they navigated unauthenticated public webpages ("UPWs") was improper rulemaking. The Order in no way affects or undermines OCR's guidance regarding covered entities disclosing unique personal identifiers, such as Google or Facebook identifiers, to third parties while patients make appointments for particular conditions, pay medical bills or log into (or use) a patient portal. *See id.* at 3-4, 31, n. 8 (vacating OCR guidance with respect to the "Proscribed Combination" defined as "circumstances where an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers" but stating that "[s]uch vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document.").

[11]     https://www.ftc.gov/business-guidance/blog/2023/07/ftc-hhs-joint-letter-gets-heart-risks-tracking-technologies-pose-personal-health-information

[12]     https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[13]

32.     Despite these clear warnings from federal regulators, Defendant Allina Health embedded Tracking Tools on its Website to secretly track its patients' communications regarding healthcare information and disclose those communications to third parties.

**B.     The Meta Pixel**

33.     Through its Web Properties, Defendant connects Plaintiffs and Class Members to Defendant's digital health care platforms with a core goal of increasing profitability.

34.     In furtherance of that goal, and to increase the success of its advertising and marketing, Defendant purposely embedded and deployed the Meta Pixel on its Website and, upon information and good faith belief, its Portal.[14] By doing so, Defendant surreptitiously shared its patients' and prospective patients' identities and online activity

---

[13] *Id.*

[14] At the time of filing this Complaint, Plaintiffs are unable to determine whether Pixels or other third-party tracking tools were embedded inside Defendant's MyChart Portal. Given Defendant's use of the Meta Pixel and Google trackers on other pages of the Website *including the log-in and sign-up pages for its patient Portal*, Plaintiffs reasonably believe and, therefore, aver that Defendant used the Pixels and other Tracking Tools to track information on its entire digital platform, including inside its MyChart Portal. *See also* Todd Feathers, *et al.*, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (June 16, 2022) (listing examples of hospitals that used third party trackers inside password-protected patient portals), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

including private communications and search results related to conditions, symptoms, treatments, and physicians with Meta.

35.     Meta's core business function is to sell advertising, and it does so on several platforms, including Facebook and Instagram. The bulk of Meta's billions of dollars in annual revenue comes from advertising—a practice in which Meta actively participates by using algorithms that approve and deny ads based on the ads' content, human moderators that further review ads for both legality and aesthetics prior to and after the ads are published, and other algorithms that connect ads to specific users, without the assistance or input of the advertiser.

36.     Over the last decade, Meta has become one of the largest and fastest growing online advertisers in the world. Since its creation in 2004, Facebook's daily, monthly, and annual user base has grown exponentially to billions of users.

37.     Meta's advertising business has been successful due, in significant part, to Meta's ability to target users, both based on information users provide to Meta, and based on other information about users Meta extracts from the Internet at large. Given the highly specific data used to target particular users, thousands of companies and individuals utilize Facebook's advertising services.

38.     One of Meta's most powerful advertising tools is the Meta Pixel, which it first launched as the Facebook Pixel in 2015.

39.     The Pixel was branded as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." Meta stated:

Facebook pixel, [is] a new way to report and optimize for conversions, build audiences[,] and get rich insights about how people use your website. We're also announcing the availability of custom conversions, a new rule-based method to track and report conversions for your Facebook ads.

Facebook pixel makes things simple for advertisers by combining the functionality of the Conversion Tracking pixels and Custom Audience pixels into a single pixel. You only need to place a single pixel across your entire website to report and optimize for conversions. Since it is built on top of the upgraded Custom Audience pixel, all the features announced in our previous blog post (Announcing Upgrades to Conversion Tracking and Optimization at Facebook) are supported through Facebook pixel as well.

[Advertisers and website operators] can use Facebook pixel to track and optimize for conversions by adding standard events (*e.g.*, Purchase) to your Facebook pixel base code on appropriate pages (*e.g.*, purchase confirmation page).[15]

40.     The Pixel is an easily attainable piece of code that Meta makes available to website developers for free. In exchange, at a minimum, website developers must agree to Meta's Business Tool Terms.[16]

41.     The Business Tools Terms note that the Meta's Business Tools including the Pixel capture two types of information: "Contact Information" which "personally identifies individuals," and "Event Data" which contains additional information about people and their use of a developer's website.[17]

---

[15] Cecile Ho, *Announcing Facebook Pixel*, Meta (Oct. 14, 2015), https://developers. facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

[16]         *See*         Meta         Business         Tool         Terms, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ 1I5uQ1zuI0STn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr ("When you use any of the Meta Business Tools . . . or otherwise enable the collection of Business Tool Data . . . these Business Tool Terms govern the use of that data").

[17] *Id.*, § 1(a)(i)-(ii).

42.     The Business Tools Terms also require websites to "provide[] robust and sufficiently prominent notice to users . . . on each web page where our pixels are used that links to a clear explanation (a) that third parties, including Meta, may . . . collect or receive information from your websites and elsewhere on the Internet and use that information to . . . deliver ads, (b) how users can opt out of the collection and use of information . . . and (c) where a user can access a mechanism for exercising such choice[.]"[18]

43.     Even with these protocols in place, Meta prohibits the disclosure of Business Tools Data "that you know or reasonably should know . . . includes health, financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[19]

44.     After agreeing to the Business Tools Terms, website developers can choose to install and use the Pixel on their websites to track and measure certain actions, such as a website visitor's text searches and page views, including the detailed URLs triggered by page views. When a website visitor takes an action a developer chooses to track on its website, the Pixel is triggered and sends data about that "Event" to Meta. All of this happens without the user's knowledge or consent.

45.     Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as a computer, tablet, or smart phone) accesses web content

---

[18] *Id.*, § 3(c)(i).

[19] *Id.*, § 1(h).

through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

46.   Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

47.   A browsing session online may consist of thousands of web communications. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- An **HTTP Request** is an electronic communication a website visitor sends from his device's browser to the website's server. There are two types of HTTP Requests: (1) GET Requests, which are one of the most common types of HTTP Requests—in addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies; and (2) POST Requests which can send a large amount of data outside of the URL. In this case, a patient's HTTP Request would be asking Defendant's Website to get certain information, such as a list of clinic locations or prescriptions. So that servers can better understand what information users are requesting, HTTP Requests also use URLs that contain parameters, which use variables and assigned values in the URL to pass additional information through the HTTP Request.

- **Cookies** are a text file that website operators and others use to store information on the website visitor's device; these can later be communicated to a server or servers. Cookies are sent with HTTP Requests from website visitor's devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website. Third-party cookies are created by a website with a domain name other than the one the user is visiting, in this case Meta.[20]

---

[20]   *Third-Party Cookie*, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable using web developer tools to inspect a website's cookies and track network activity.

There are also "first-party cookies," like the fbp cookie, which is created by the website the user is visiting, in this case Defendant.[21] Meta uses both first- and third-party cookies in Pixel to link Facebook IDs and Facebook profiles, and Defendant sends these identifiers to Meta.

- An **HTTP Response** is a response to an HTTP Request. It is an electronic communication that is sent as a reply to the website visitor's device's web browser from the host server. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data. The HTTP Response is when the website sends the requested information (*see* the HTTP Request); this is sometimes called the "Markup."

48. A user's HTTP Request asks Defendant's Website to retrieve certain information (such as "Orthopedics"). The HTTP Response then renders or loads the requested information in the form of Markup (i.e., the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Website).

49. Every website, including Defendant's, is composed of Markup and "Source Code."

50. Source code is a set of instructions that commands the website visitor's browser to take certain actions when the web page loads or when a specified event triggers the code.

51. Source code may also command a web browser to transmit data to third parties in the form of an HTTP Request. Such data transmissions allow a website to export data about users and their actions to third parties. Third parties receiving this data are typically configured to track user data and communications for marketing purposes.

---

[21] *First-Party Cookie*, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable using web developer tools to inspect a website's cookies and track network activity.

52.     Transmission of a such data occurs in the background without notifying the web browser's user. The pixels are invisible to website users and thus, without any knowledge, authorization, or action by the user, the website site developer (or website commander) can use its source code to contemporaneously and invisibly re-direct the user's PII and PHI to third parties. Through the Pixel, Defendant uses source code that can accomplish just that.

53.     The Pixel "tracks the people and the types of actions they take."[22] According to Meta, the Pixel is a piece of code that allows Defendant to measure the effectiveness of [its] advertising by understanding the actions [website visitors] take on [its] website."[23] Thus, by secretly recording and transmitting data to Meta—without the user's knowledge or consent—the Pixel acts much like a traditional wiretap controlled by Defendant.

54.     Through this online tracking technology, Meta intercepts each page a user visits, what buttons they click, as well as the specific information the user inputs into the website and other searches conducted. The Pixel sends each of these pieces of information to Meta with PII, such as the user's IP address. Meta stores this data on its own servers, in some instances for years on end, and independently uses the data for its own financial gain.

55.     This data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account (or has been logged in recently) when the user visits Defendant's website, Meta receives third-party cookies

---

[22] *Retargeting*, Facebook, https://www.facebook.com/business/goals/retargeting.

[23] *About Meta Pixel*, Meta Business Help Center, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

allowing Meta to link the data collected by the Pixel to the specific Facebook user. In other words, a user's personal and private information sent by the Meta Pixel to Facebook is sent alongside that user's personal identifiers, including IP address and cookie values, which can be linked to the user's unique Facebook account.

56.     Meta accomplishes this by placing cookies in the web browsers of users logged into their services, which aids Meta in identifying users.

57.     One such example is the "c_user" cookie, which is a third-party cookie assigned to each person with a Facebook account. The "c_user" cookie contains a numerical value known as the Facebook ID that uniquely identifies a Facebook user. It is composed of a unique and persistent set of numbers.

58.     A user's Facebook ID is linked to their Facebook profile, which contains a wide range of demographic and other information about the user including pictures, personal interests, work history, relationship status, and other details.

59.     Because a user's Facebook ID uniquely identifies their Facebook account, Meta—or any ordinary person—can use the Facebook ID to locate, access, and view the user's corresponding Facebook profile. Thus, when a Facebook user visits Defendant's Website while logged in to their Facebook account, the Pixel transmits the user's private web communications with Defendant along with the "c_user" cookie. Meta can then use this information to match the web communications with the user's Facebook ID.

60.     Even if a user does not have a Facebook account or is not logged in to Facebook when browsing Defendant's Website, the Pixel transmits the user's web communications with Defendant's Website to Meta along with a unique identifier

associated with another cookie called the "_fbp" cookie. Meta can then use that unique identifier to link the user's web communications with the user's Facebook ID. And if a user who does not have a Facebook account later creates an account, Meta may be able to associate the user's historical browsing history intercepted via the Pixel and "_fbp" cookie to the newly created account.

61.    Meta's Business Tools Terms make clear that the Pixel is meant to "match the Contact Information" of users "against user IDs . . . as well as to combine those user IDs with corresponding Event Data."[24]

62.    After Meta processes users' intercepted information, it makes the relevant analytics available to Allina Health through Meta's Event Manager tool.

63.    Using the Events Manager, Allina Health can review a summary of users' activity including the pages, parameters, and URLs sent through the Pixel,[25] as well as any included metadata.[26]

---

[24]    *Meta Business Tool Terms, Section 2(a)(i)(1)*, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ 1I5uQ1zuI0STn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr.

[25]    *How to view pages, parameters and URLs in Meta Events Manager*, https://www.facebook.com/business/help/815029860145251 ("In Meta Events Manager, you can see a summary of pages, parameters and URLs recently sent through the Meta Pixel . . . .").

[26]    A web developer using the Events Manager can "[c]lick on the filter icon to select what activity types and details are display." Developers can sort by activity types, including "automatically logged pixel events," which may contain metadata. *Test your app or web browser events using the test events tool*, https://www.facebook.com/business/help/2040882565969969?id=1205376682832142.

64.     Without any knowledge, authorization, or action by a user, a website owner like Defendant can use its Source Code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to Meta. Meta then uses this information to match the user with their Facebook ID.

65.     Judge William H. Orrick on the United States District Court for the Northern District of California summarized how this process plays out:

> To understand how the Meta Pixel typically works, imagine the following scenario. A shoe company wishes to gather certain information on customers and potential customers who visit its website. The shoe company first agrees to Meta's Business Tools Terms (discussed below), which govern the use of data from the Pixel. The shoe company then customizes the Meta Pixel to track, say, every time a site visitor clicks on the "sale" button on its website, which is called an "Event." Every time a user accesses the website and clicks on the "sale" button (i.e., an "Event" occurs), it triggers the Meta Pixel, which then sends certain data to Meta. Meta will attempt to match the customer data that it receives to Meta users—Meta cannot match non-Meta users. The shoe company may then choose to create "Custom Audiences" (i.e., all of the customers and potential customers who clicked on the "sale" button) who will receive targeted ads on Facebook, Instagram, and publishers within Meta's Audience Network. Meta may also provide the shoe company with de-identified, aggregated information so the shoe company understands the impact of its ads by measuring what happens when people see them. Meta does not reveal the identity of the matched Meta users to the shoe company.[27]

66.     The Pixel also allows a healthcare company, like Defendant, to impact the delivery of ads, measure cross-device conversions, create custom audiences, and save

---

[27] *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *2 (N.D. Cal. Dec. 22, 2022) (internal citations omitted). In describing Pixel technology in *In re Meta Pixel Healthcare Litigation*, the court referenced the declaration of expert Richard M. Smith, which details the manner in which the challenged Pixel technology works and Meta's arrangements with health providers that employ it. *See* Declaration of Richard M. Smith, *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO (N.D. Cal.) [ECF 49].

money on advertising and marketing costs.[28] But, most relevant here, the Pixel allowed Defendant and Meta to track users secretly on Defendant's Web Properties and intercept their communications with Defendant.

67.     When visitors to Defendant's Web Properties, like Plaintiffs and Class Members, communicated with Defendant or inquired about personal health-related topics, that information was transmitted to and intercepted by Meta.

68.     The PHI intercepted, recorded, and transmitted to Meta includes, but is not limited to, exact search terms and search results, patient status, health symptoms, health conditions, treatments, appointment details, and physicians and locations sought.

69.     During that same transmission, Defendant would also provide Meta with the patient's PII, such as their Facebook ID number, persistent cookies, device ID, and computer IP addresses. This information makes it easy to link private communications with Defendant via the Web Properties to a specific and identifiable Facebook user.

70.     Once Meta has that data, it processes, analyzes, and assimilates it into databases like Core Audiences or Custom Audiences for advertising purposes. If the website visitor is also a Facebook user, Meta will associate the information that it collects from the visitor with a Facebook ID that identifies the user's name and Facebook profile.

71.     In sum, the Pixel allows Meta to learn, manipulate, and use for financial gain, the medical and private content Defendant's Web Properties visitors communicated, viewed, or otherwise interacted with on Defendant's Web Properties.

---

[28]*Meta Pixel,* https://www.facebook.com/business/tools/meta-pixel?ref=search_new_2.

**C.      Google Tracking Code.**

72.   Like the Meta Pixel, Google creates code that website developers can install on their websites to track user activity. Whenever a user visits a website that is running Google tracking code, Google's code directs the user's browser to send a separate and concurrent communication to Google without the user's knowledge.

73.   The information that is intercepted and transmitted to Google via the Google tracking code includes: (i) the URL of the specific webpage a user is trying to access; (ii) the user's IP address; (iii) the User-agent, which identifies the user's device platform and browser; (iv) the user's geolocation, if available; (v) the Referer, which is the URL of the page on which the user clicked a link to access a new page; (vi) event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and (vii) actual search queries on the site.

74.   Google tracking code tells Google exactly what a user's browser communicated to the website.

75.   Like with the Meta Pixel, the user's communications to the website are transmitted to Google together with cookies and other unique identifiers that Google can use to match the communications to individuals who use Google's services.

76.   Information sent to Google is sent alongside the users' unique identifier ("_ga" or "CID" cookies), thereby allowing individual patients' communications with

Allina, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.[29]

77.   Google logs a user's browsing activities on non-Google websites and uses this data for serving personalized ads.

**D.   Allina Health Deploys Third-Party Tracking Tools to Intercept and Disclose PHI and PII.**

78.   As an example of how the Meta Pixel operated on Allina's Website, consider a visitor who goes to the Website and uses the search bar to search for "cancer."

79.   The search result takes the visitor to the https://www.allina health.org/search?q=cancer webpage. When doing so, the visitor's browser sends a GET Request to Defendant's server, requesting that server to load the webpage.

80.   At the same time, the Pixel causes the visitor's browser to secretly intercept and record the visitor's communication with Allina's Website including the specific URL requested and transmit the private communication to Meta with unique identifiers used to link the communication to a specific Facebook user, as shown in **_Figure 1_**:

---

[29] *See Brown v. Google LLC*, 2023 WL 5029899, at fn. 6, *supra*, note 3 (quoting Google employee deposition testimony explaining how Google tracks user data).



*Figure 1: Depiction of user's search information for "cancer" intercepted and recorded by Meta.*

81.     As reflected in ***Figure 1***, the "dl" path shows the specific URL for the page requested by the visitor's browser, including the substantive description and disclosure of the visitor's search for "cancer." This transmission, as explained herein, also contains the Pixel's transmission of the _fbp cookie, the c_user cookie (the Facebook ID), and other cookies and identifiers used to identify the website visitor by name and Facebook account. Thus, the fact that a patient or prospective patient is using or considering using Allina Health for healthcare services related to cancer is transmitted to Meta. Disclosure of that information reveals to Meta the website visitor's status as a patient or prospective patient with Allina Health, seeking services or treatment for cancer.

82.     If that same patient inquired about specific cancer treatment center or a provider specializing in cancer, the Pixel would likewise intercept those communications and transmit them to Meta along with the patient's unique identifiers, as reflected in *Figures 2-4* below:



*Figure 2: Depiction of a patient's search for a "Cancer (oncology)" provider on Allina Health's Website being disclosed to Meta via a 'PageView' event.*





*Figures 3-4: Depiction of a patient's search for in-person care, with PHI and PII (including the c_user, datr, fr and the _fbp cookies) disclosed by Allina's Meta Pixel via a 'Microdata' event*

83.    Defendant's Meta Pixel captured and disclosed the details of a patient's in-person care appointment as well, including whether they were making it for themselves, the visit type (ex., "18 years or older – Care for illness, injury, chronic condition management or other health concerns"), the fact that the patient was choosing an Allina location andsor provider, whether they were signing in or continuing to book as a guest, and the fact that the patient did actually schedule an appointment, via Microdata and SubscribedButtonClick events Allina configured its Meta Pixel to capture.

84.    The Website provides an option for patients to make an appointment with a specialist. If the patient clicks to make an appointment, the Pixel intercepts those communications and transmits them to Meta with the patient's unique identifiers, as reflected below:



*Figure 5: Depiction of a SubscribedButtonClick "event" disclosing that the patient is making an appointment, along with the Facebook fbp cookie.*

85.     Further, Allina's Website captured disclosed patients' communications as they logged into and signed up for the patient portal, and patients' bill pay activities, see *Figures 6-7* below:





*Figures 6-7: Depiction of Defendant capturing and disclosing patient's bill payment activities, with PHI and PII (including the c_user, datr, fr and the _fbp cookies) disclosed by Allina's Meta Pixel via 'Microdata' and 'SubscribedButtonClick' events.*

86.     In each of the examples above, the user's website activity and the contents of the user's communications are sent to Facebook alongside their personally identifiable information. Several different methods allow marketers and third-parties to identify individual website users, but the examples above demonstrate what happens when the website user is logged into Facebook on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's c_user cookie, which contains that user's unencrypted Facebook ID, and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

87.     Facebook receives several cookies when Allina's Website transmits information via the Pixel, including the c_user, datr, and fr cookies, as evidenced by the images *supra*.

88.     The "datr" cookie contains a unique alphanumeric code and identifies the specific web browser from which the user is sending the communication. It is an identifier that is unique to the user's web browser and is therefore a means of identification for Meta. Meta keeps a record of every datr cookie identifier associated with each of its users.

89.     The fr cookie, a unique combination of the c_user and datr cookies, contains an encrypted Facebook ID and browser identifier.[30] Facebook, at a minimum, uses the fr cookie to identify users, and this particular cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.[31]

90.     The datr and fr cookies are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. Although Facebook created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout the Allina Website.

---

[30] Data Protection Commissioner, *Facebook Ireland Ltd: Report of Re-Audit*, p. 33 (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf (last visited Aug. 30, 2024).

[31] *Cookies & other storage technologies*, https://www.facebook.com/policy/cookies/ (last visited Aug. 30, 2024).

91.   Defendant also revealed the Website visitors' identities via first-party cookies such as the _fbp cookie that Facebook uses to identify a particular browser and a user, *see Figure 8:*



92.   The fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Allina's use of the Facebook Meta Pixel program. The fbp cookie emanates from Defendant's Website as a putative first party cookie, but is transmitted to Facebook through cookie synching technology that hacks around the same-origin policy. Therefore, the _fbp cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies.

93.   The __ga and _gid cookies operate similarly as to Google.

94.   The Facebook Pixel uses both first- and third-party cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and, because the Pixel is automatically programmed to transmit data via both first-party

and third-party cookies, customers' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

95.    At present, the full breadth of Allina's tracking and data sharing practices is unclear, but other evidence suggests Defendant has been using additional Tracking Tools to transmit its patients' Private Information to additional third parties. For example, Plaintiffs' counsels' investigation revealed that Defendant is also sending their patients' protected health information to Google via Google tracking tools including Google Analytics and Google Tag Manager.

96.    Google Tracking Tools installed on the Allina Website appear to collect the same types and categories of sensitive Private Information from Defendant's patients as the Facebook Pixel.



*Figure 9: Example of Allina's Website sending information to Google that a patient is attempting to pay their bill.*

97.    As described *supra*, this information is shared with Google along with the CID, __ga and _gid cookies.

98.    Based on the above examples of how the Tracking Tools operate on Allina Health's Website, Meta and Google would know (i) that a particular individual—who Meta and Google could identify based on their respective accounts—was a patient or prospective patient of Allina Health seeking healthcare services, (ii) that the named patient searched for information regarding their specific medical condition (for example, cancer), and (iii) that the patient in question was attempting to make an appointment with specific physicians, pay their bill, or log into their patient portal.

99.    Meta and Google would also know the named patient's location and IP address, among other identifiers associated with the patient's computer or cell phone.

100.    Using this PHI and PII, technology companies can put the named patient into a Core or Custom Audience for purposes of targeted advertising by Allina Health or any other company seeking to advertise its services or products to individuals that fit the named patient's profile.

101.    Allina Health, Meta, Google, and other third parties profit off of Plaintiffs' and Class Members' PHI and PII without their knowledge, consent, or authorization.

102.    Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (a) embedded and implemented the Tracking Tools, which surreptitiously intercepted, recorded, and disclosed Plaintiffs' and other online patients' and prospective

patients' confidential communications and private information; (b) disclosed patients' and prospective patients' protected information to Meta and Google—unauthorized third parties; and (c) failed to provide notice to or obtain the consent from Plaintiffs and Class Members to share their PHI and PII with others.

**E.     Plaintiffs' Representative Experiences.**

*Plaintiff Gonzales*

103.   Plaintiff Gonzales accessed and used the Allina Website through her computer and mobile devices while located in Minnesota to seek medical treatment as recently as August 2024.

104.   Plaintiff Gonzales has been a patient of Allina since approximately 2014.

105.   Plaintiff Gonzales began using Defendant's Website in 2014 to, among other things, search for specialty providers including ▮▮▮▮▮▮▮▮ in May 2023, search for Allina locations, pay for medical services, schedule appointments, use the Patient Portal, and search for information regarding treatments and conditions for medical conditions.

106.   Information that Plaintiff Gonzales provided to Defendant via its Website included queries about her medical conditions as well as for specialty doctors.

107.   Plaintiff Gonzales had an active Facebook account and an active Google account during the time she was providing her PHI and PII to Defendant via its Website.

108.   After she provided information to Defendant regarding her PHI and PII, Plaintiff Gonzales began receiving advertisements on her Facebook account for ▮▮▮ ▮▮▮▮▮▮▮ .

109.    Plaintiff Gonzales reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by any third party without her full knowledge and informed consent.

110.    Plaintiff Gonzales provided her PHI and PII to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

111.    As described herein, Defendant worked along with Facebook to intercept Plaintiff Gonzales communications, including those that contained confidential PHI and PII, while Plaintiff Gonzales was within the state of Minnesota.

112.    Defendant willfully facilitated these interceptions without Plaintiff Gonzales' knowledge, consent or express written authorization.

113.    Within the State of Minnesota, Defendant transmitted Plaintiff Gonzales' FID, unique Google identifiers, computer IP address, location, information such as medical treatments and conditions, the information on physician(s) she selected and her sensitive and private medical information to Facebook and Google.

114.    The full scope of Defendant's interceptions and disclosures of Plaintiff's communications to third party data brokers can only be determined through formal discovery. However, Defendant intercepted at least communications about Plaintiff's past or present patient status, medical conditions, treatments sought including ███████████ ██████, and the locations for receipt of healthcare, via descriptive long-URLs, microdata and the inner text of buttons clicked by Plaintiff on the Website, that were sent to Meta via

the Pixel and which contained information concerning Plaintiff's specific medical conditions, queries, and treatments sought.

115.   By doing so without her consent, Defendant breached Plaintiff Gonzales' right to privacy and unlawfully disclosed her PHI and PII.

116.   Defendant did not inform Plaintiff Gonzales that it shared her PHI and PII with Facebook.

117.   Plaintiff Gonzales suffered damages in, inter alia, the form of (i) invasion of privacy; (ii) violation of confidentiality of her PHI and PII; (iii) loss of benefit of the bargain; (iv) diminution of value of the PHI and PII; (v) statutory damages and (vi) the continued and ongoing risk to her PHI and PII.

118.   Plaintiff Gonzales has a continuing interest in ensuring that her PHI and PII is protected and safeguarded from future unauthorized disclosure. Plaintiff Gonzales wants to continue to communicate through online platforms but has no practical way of knowing if her communications are being intercepted and disclosed to Facebook and/or Google, and thus continues to be at risk of harm from Defendant's conduct.

### Plaintiff Streich

119.   Plaintiff Streich accessed and used the Allina Website through her computer and mobile devices while located in Minnesota to seek medical treatment as recently as June 2024.

120.   Plaintiff Streich has been a patient of Allina since at least 2009.

121.   Plaintiff Streich began using Defendant's Website at least fifteen (15) years ago to, among other things, look up her medical symptoms including ███████████

████████, medications for her medical conditions including ████████, search for Allina locations, pay for medical services, schedule appointments, use the Patient Portal, and search for information regarding symptoms, treatments and conditions for medical conditions including ████████████████.

122.   Information that Plaintiff Streich provided to Defendant via its Website included queries about her medical conditions, symptoms, as well as her prescribed medications.

123.   Plaintiff Streich had an active Facebook account and an active Google account during the time she was providing her PHI and PII to Defendant via its Website.

124.   After she provided information to Defendant regarding her PHI and PII, Plaintiff Streich began receiving advertisements on her Facebook account for ████████████████████████████████████████████████████████.

125.   Plaintiff Streich reasonably expected that her communications with Defendant via the Website were confidential, solely between herself and Defendant, and that such communications would not be transmitted to or intercepted by any third party without her full knowledge and informed consent.

126.   Plaintiff Streich provided her Private Information to Defendant and trusted that the information would be safeguarded according to Defendant's policies and state and federal law.

127.   As described herein, Defendant worked along with Facebook to intercept Plaintiff Streich communications, including those that contained confidential PHI and PII, while Plaintiff Streich was within the state of Minnesota.

128.    Defendant willfully facilitated these interceptions without Plaintiff Streich's knowledge, consent or express written authorization.

129.    Within the State of Minnesota, Defendant transmitted Plaintiff Streich's FID, unique Google identifiers, computer IP address, location, information such as medical treatments and conditions, the information on physician(s) she selected and her sensitive and private medical information to Facebook and Google.

130.    The full scope of Defendant's interceptions and disclosures of Plaintiff's communications to third party data brokers can only be determined through formal discovery. However, Defendant intercepted at least communications about Plaintiff's past or present patient status, medical conditions, treatments sought, and the locations for receipt of healthcare, via descriptive long-URLs that were sent to Meta via the Pixel and which contained information concerning Plaintiff's specific medical conditions, queries, and treatments sought.

131.    By doing so without her consent, Defendant breached Plaintiff Streich's right to privacy and unlawfully disclosed her PHI and PII.

132.    Defendant did not inform Plaintiff Streich that it shared her PHI and PII with Facebook.

133.    Plaintiff Streich suffered damages in, inter alia, the form of (i) invasion of privacy; (ii) violation of confidentiality of her PHI and PII; (iii) loss of benefit of the bargain; (iv) diminution of value of the PHI and PII; (v) statutory damages and (vi) the continued and ongoing risk to her PHI and PII.

134. Plaintiff Streich has a continuing interest in ensuring that her PHI and PII is protected and safeguarded from future unauthorized disclosure. Plaintiff Streich wants to continue to communicate through online platforms but has no practical way of knowing if her communications are being intercepted and disclosed to Facebook and/or Google, and thus continues to be at risk of harm from Defendant's conduct.

**F.     Allina's Conduct Violates Its Own Privacy Policies and Promises.**

135. Defendant's privacy policies represent to Plaintiffs and Class Members that Defendant will keep PHI and PII private and confidential and Allina will only disclose PHI under certain circumstances.

136. Allina's Notice of Privacy Practices represents to patients and Website visitors that Defendant will keep PHI confidential and will only disclose it under certain circumstances, none of which apply here.[32]

137. Defendant affirmatively represents that "*[w]e may use or disclose health information only with your written permission . . . Most uses and disclosures of* psychotherapy notes (special notes kept by mental health providers for only their own use when treating a patient), *health information for marketing purposes, and the sale of health information require written authorization*."[33]

---

[32] Allina's Notice of Privacy Practices, https://sc.dx-stg.allinahealth.org/customer-service/-/media/allina-health/files/customer-service/mn-and-wi-notice-of-privacy-practices.pdf.

[33] *Id*. (emphasis added).

138.    Allina's Privacy Policy explains Defendant's legal duties with respect to PHI and PII and the exceptions for when Defendant can lawfully use and disclose it.

139.    The Privacy policy states, "[s]ome of the information Allina Health collects through this site may be "personal information" – information that identifies you personally, alone or in combination with other information available to us."[34]

140.    Defendant's Privacy Policy lists examples of personal information that includes contact name, demographic data, insurance data, and health and medical data.[35]

141.    Allina's examples of how and where it collects PHI and PII do not include patients' searches for specific medical conditions, treatments, providers, appointment details, nor does Defendant disclose that it will collect PHI and PII and send it to third-party data brokers, such as Meta, for marketing purposes.

142.    Defendant's Privacy Policy does not permit Defendant to intercept, transmit, or disclose Plaintiffs' and Class Members' PHI and PII to third parties, including Meta, for marketing purposes.

143.    Defendant's Privacy Policy states that Defendant uses Google Analytics "that helps [Allina Health] understand how visitors engage with our Sites." But Google specifically advises its customers that they "must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities

---

[34] Allina Health's Privacy Policy, https://www.allinahealth.org/footer/privacy-policy.

[35] *Id.*

using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies."[36]

144.    Defendant violated its own privacy policies by unlawfully intercepting and disclosing Plaintiffs' and Class Members' PHI and PII to Meta and other third parties without adequately disclosing that it shares such information with third parties and without acquiring the specific patients' consent or authorization to share it.

**F.    Exposure of PHI and PII Creates a Substantial Risk of Harm.**

145.    The FTC has recognized that consumer data is a lucrative and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[37]

146.    The FTC also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business. According to the FTC, reasonable data security protocols require, among other

---

[36]    *HIPAA and Google Analytics*, https://support.google.com/analytics/answer/13297105?hl=en ("[f]or HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS Bulletin provides specific guidance on when data may and may not qualify as PHI").

[37] *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, at 2 (Dec. 7, 2009) https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

things: (i) using industry tested and accepted methods; (ii) monitoring activity on networks

to uncover unapproved activity; (iii) verifying that privacy and security features function

properly; and (iv) testing for common vulnerabilities or unauthorized disclosures.[38]

147.    The FTC cautions businesses that failure to protect PHI and PII and the

resulting privacy breaches can destroy consumers' finances, credit history, and reputations,

and can take time, money, and patience to resolve the effect.[39] Indeed, the FTC treats the

failure to implement reasonable and adequate data security measures as an unfair act or

practice prohibited by Section 5(a) of the FTC Act.

**G.    Plaintiffs' and Class Members' PHI and PII is Valuable.**

148.    As many health care data industry experts have recognized, "[p]atients'

medical data constitutes a cornerstone of the big data economy. A multi-billion dollar

industry operates by collecting, merging, analyzing[,] and packaging patient data and

selling it to the highest bidder."[40]

---

[38] *Start With Security, A Guide for Business,* https://www.ftc.gov/business-guidance/resources/start-security-guide-business.

[39] *See Taking Charge: What to Do if Your Identity is Stolen*, FTC, at 2 (2012), https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf.

[40] Niam Yaraghi, *Who should profit from the sale of patient data?,* The Brookings Institution (Nov. 19, 2018), https://www.brookings.edu/blog/techtank/2018/11/19/who-should-profit-from-the-sale-of-patient-data/.

149.    The personal, health, and financial information of Plaintiffs and Class Members is valuable and has become a highly desirable commodity. One of the world's most valuable resources is the exchange of personal data.[41]

150.    Business News Daily reported that businesses collect personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., consumer interaction with a business's website, applications, and emails), behavioral data (i.e., customers' purchase histories and product usage information), and attitudinal data (i.e., consumer satisfaction data) from consumers.[42] Companies then use this data to impact the customer experiences, modify their marketing strategies, publicly disclose or sell data, and even to obtain more sensitive data that may be even more lucrative.[43]

151.    The power to capture and use customer data to manipulate products, solutions, and the buying experience is invaluable to a business's success. Research shows that organizations who "leverage customer behavioral insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[44]

---

[41] *The world's most valuable resource is no longer oil, but data* (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[42] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)* (Aug. 5, 2022; updated May 30, 2023), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

[43] *Id.*

[44] Brad Brown, *et al.*, *Capturing value from your customer data* (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

152.    In 2013, the Organization for Economic Cooperation and Development ("OECD") published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[45] There, OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[46]

153.    OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e., $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[47]

154.    Unlike financial information, such as credit card and bank account numbers, PHI and certain PII cannot be easily changed. Dates of birth and social security numbers are given at birth and attach to a person for the duration of his or her life. Medical histories are inflexible. For these reasons, these types of information are the most lucrative and valuable.[48]

---

[45] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220, OECD PUBLISHING PARIS (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[46] *Id.* at 25.

[47] *Id.*

155.    Consumers place considerable value on their PHI and PII and the privacy of that information.

156.    Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[49]

157.    CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[50]

158.    Marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[51]

---

[48] *Calculating the Value of a Data Breach – What Are the Most Valuable Files to a Hacker?* Donnellon McCarthy Enters (July 21, 2020), https://www.dme.us/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/.

[49] *See* https://time.com/4588104/medical-data-industry/.

[50]    *See*    https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

[51]    VERO, HOW TO COLLECT EMAILS ADDRESSES ON TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/.

159.    Several companies have products through which they pay consumers for a license to track their data. For example, Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect pay for browsing historical information.

160.    Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages of 13 and 35.

161.    Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[52]

162.    Defendant's privacy violations exposed a variety of PHI including patient status, health conditions and symptoms, physicians, and other highly sensitive data.

163.    PHI, like that exposed here, is likely even more valuable than Social Security numbers and just as capable of being misused.[53] PHI can be ten times more valuable than credit card information.[54] This is because one's personal health history, including prior illness, surgeries, diagnoses, mental health, prescriptions, and the like cannot be changed

---

[52] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

[53] *FBI Cyber Division Bulletin: Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI (April 8, 2014), https://publicintelligence.net/fbi-health-care-cyber-intrusions/#:~:text=(U)%20Cyber%20actors%20will%20likely,records%20in%20the%20black%20market.

[54] Tim Greene, *Anthem hack: Personal data stolen sells for 10x Price of Stolen Credit Card Numbers*, https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

or replaced, unlike credit card information and even, under difficult circumstances, Social Security numbers.[55]

164.    Some industry insiders and journalists are even calling hospitals the "brokers to technology companies" for their role in data sharing in the $3 trillion healthcare sector.[56] "Rapid digitization of health records . . . have positioned hospitals as a primary arbiter of how much sensitive data is shared."[57]

**H.    Plaintiffs and Class Members had a Reasonable Expectation of Privacy in their Interactions with Defendant's Web Properties.**

165.    Consumers assume the data they provide to hospitals will be kept secure and private.

166.    In a survey related to Internet user expectations, most website visitors indicated that their detailed interactions with a website should only be used by the website

---

[55] *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

[56] Melanie Evans, *Hospitals Give Tech Giants Access to Detailed Medical Records* (Jan. 20, 2020), https://www.wsj.com/articles/hospitals-give-tech-giants-access-to-detailed-medical-records-11579516200.

[57] *Id.*

and not be shared with a party they know nothing about.[58] Website visitors expect that their interactions with a website should not be released to third parties unless explicitly stated.[59]

167.    The majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its' customers' data.[60] A March 2000 BusinessWeek/Harris Poll found that 89 percent of respondents were uncomfortable with web tracking schemes where data was combined with an individual's identity.[61] The same poll found that 63 percent of respondents were uncomfortable with web tracking even where the clickstream data was not linked to personally identifiable information.[62] A July 2000 USA Weekend Poll showed that 65 percent of respondents thought that tracking computer use was an invasion of privacy.[63]

168.    Patients and website users act consistently with their expectation of privacy. For example, following a new rollout of the iPhone operating software—which asks users

---

[58] *See Privacy and Online Tracking Perceptions Survey Report* (March 2020), CUJOAI, at 15–19, Privacy Survey_03-24 (cujo.com) (indicating major concerns of survey respondents was illegal use of data and unethical tracking and indicating respondents' belief that responsibility allocation falls on websites, and Internet users should be able to turn to the websites themselves, for privacy breaches).

[59] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, *Session Replay Scripts: A Privacy Analysis*, THE INFORMATION SOCIETY, 38:4, 257-258 (2022).

[60] *Public Opinion on Privacy*, EPIC.ORG, https://archive.epic.org/privacy/survey/.

[61] *Id.*

[62] *Id.*

[63] *Id.*

for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[64]

169.    Like the greater population, Defendant's patients and prospective patients would expect the highly sensitive medical information they provided to Defendant through the Website to be kept secure and private.

## I.    Defendant's Conduct Violates HIPAA.

170.    Under HIPAA, individuals' health information must be:

properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well-being. The [Privacy] Rule strikes a balance that permits important uses of information, while protecting the privacy of people who seek care and healing.[65]

171.    HIPAA "is a federal law that required the creation of national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge."[66] The rule requires appropriate administrative, physical, and

---

[64]    Margaret Taylor, *How Apple screwed Facebook* (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook.

[65] *Summary of the HIPAA Privacy Rule* (Oct. 19, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

[66] *Health Insurance Portability and Accountability Act of 1996 (HIPAA)* (June 27, 2022), https://www.cdc.gov/phlp/publications/topic/ hipaa.html#:~:text=Health%20Insurance%20Portability%20and%20Accountability%20A ct%20of%201996%20(HIPAA),- On%20This%20Page&text=The%20Health%20Insurance%20Portability %20and,the%20patient's%20consent%20or%20knowledge.

technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information.[67]

172.    HIPAA defines PHI as "individually identifiable health information" that is "created or received by a health care provider" (or similar entities) that "[r]elates to past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." 45 C.F.R. § 160.103.

173.    Identifiers such as patient-status (i.e., information that connects a particular user to a particular health care provider), medical conditions, health symptoms, treatments, and physicians, gathered in this case by the Tracking Tools through Allina Health's Website, constitute protected health information.

174.    To ensure protection of this private and sensitive information, HIPAA mandates standards for handling PHI—the very data Defendant failed to protect.

175.    According to the HHS Bulletin, HIPAA covered entities cannot share PHI or PII to online tracking technology vendors for marketing purposes without first obtaining the individual's HIPAA-compliant authorization.[68]

176.    The HHS Bulletin explicitly states:

The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors

---

[67] *See supra*, note 57.

[68] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, *supra*, note 7.

includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[69]

177.   The HHS Bulletin also identifies several harms that may result from an impermissible disclosure of an individual's PHI, including:

> identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, OCR is providing this reminder that it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.[70]

178.   According to HHS, "[s]ome regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps."[71]

---

[69] *Id.* (internal citations omitted) (emphasis in original).

[70] *Id.* (internal citations omitted) (emphasis in original).

[71] *Id.*

179.   IIHI "collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity."[72]

180.   When a regulated entity, like Defendant, collects the individual's information, that information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health, health care, or payment for care.

181.   When Plaintiffs communicated with Allina Health regarding "treatment options" and other health-related information on the Allina Health Website, the Tracking Tools intercepted and disclosed those communications to Meta and Google in violation of HIPAA's Privacy Rule.

## CLASS ACTION ALLEGATIONS

182.   Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similar situated,

183.   The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States whose PHI and PII was disclosed to a third party through Defendant's Web Properties without authorization or consent during the applicable statute of limitations period.

184.   The Minnesota Sub-Class that Plaintiffs seek to represent is defined as follows:

---

[72] *Id.*

All individuals residing in the State of Minnesota whose PHI and PII was disclosed to a third party through Defendant's Web Properties without authorization or consent during the applicable statute of limitations period.

185. The Nationwide Class and Minnesota Sub-Class are collectively referred to as the Class.

186. **The following people are excluded from the Class:** (1) any Judge or Magistrate presiding over this action and members of their immediate families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors and any entity in which Defendant or its parents have a controlling interest and its current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' and Defendant's counsel and (6) the legal representatives, successors and assigns of any such excluded persons.

187. Plaintiffs reserve the right under Federal Rule of Civil Procedure 23 to amend or modify the Class to include a broader scope, greater specificity, further division into subclasses, or limitations to particular issues.

188. All members of the proposed Class are readily identifiable through Defendant's records.

189. All requirements for class certification under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) are satisfied.

190. **Numerosity**. The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiffs are informed and believe that the proposed

Classes includes tens of thousands of people based on Allina Health's reported patient visits per year. The precise number of Class Members is unknown to Plaintiffs but may be ascertained from Defendant's records.

191.    **Commonality and Predominance.** This action involves common questions of law and fact to Plaintiffs and Class Members, which predominate over any questions only affecting individual Class Members. These common legal and factual questions include, without limitation:

a.  Whether Plaintiffs' and Class Members' private communications were intercepted, recorded, and disclosed;

b.  Whether the interception, recording, and disclosure of Plaintiffs' and Class Members' communications was consensual;

c.  Whether Defendant owed Plaintiffs and the other Class Members a duty to adequately protect their PHI and PII;

d.  Whether Defendant owed Plaintiffs and the other Class Members a duty to secure their PHI and PII from interception and disclosure via third-party tracking technologies;

e.  Whether Defendant owed Plaintiffs and the other Class Members a duty to implement reasonable data privacy protection measures because Defendant accepted, stored, created, and maintained highly sensitive information concerning Plaintiffs and the Classes;

f.  Whether Defendant knew or should have known of the risk of disclosure of data through third-party tracking technologies;

g.  Whether Defendant breached its duty to protect the PHI and PII of Plaintiffs and the other Class Members;

h.  Whether Defendant knew or should have known about the inadequacies of its privacy protection;

    i.   Whether Defendant failed to use reasonable care and reasonable methods to safeguard and protect Plaintiffs' and the Classes' PHI and PII from unauthorized disclosure;

    j.   Whether proper data security measures, policies, procedures, and protocols were enacted within Defendant's computer systems to safeguard and protect Plaintiffs' and the Classes' PHI and PII from unauthorized disclosure;

    k.   Whether Defendant's conduct was the proximate cause of Plaintiffs' and the Classes' injuries;

    l.   Whether Plaintiffs and Class Members had a reasonable expectation of privacy in their PHI and PII;

    m.  Whether Plaintiffs and Class Members suffered ascertainable and cognizable injuries as a result of Defendant's misconduct;

    n.   Whether Plaintiffs and Class Members are entitled to recover damages; and

    o.   Whether Plaintiffs and Class Members are entitled to other appropriate remedies including injunctive relief.

192.   Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiffs on behalf of themselves and the Class. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

193.   **Typicality.** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' PHI and PII, like that of every other Class Member, was improperly disclosed by Defendant. Defendant's misconduct impacted all Class Members in a similar manner.

194.   **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class and have retained counsel experienced in complex

consumer class action litigation and intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes.

195.   **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims. There will be no difficulty in managing this action as a class action, and the disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court. Absent a class action, individual patients like Plaintiffs would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

196.   Class Certification under Fed. R. Civ. P. 23(b)(2) is also appropriate. Defendant has acted or refused to act on grounds that apply generally to the Class, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate. As Defendant continues to engage in the practices described herein, the risk of future harm to Plaintiffs and the Class remains, making injunctive relief appropriate. The prosecution of separate actions by all affected individuals with injuries similar to Plaintiffs', even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual patients, which would establish potentially incompatible standards of conduct for Defendant, and/or (b) adjudications with respect to

individual patients which would, as a practical matter, be dispositive of the interests of the other patients not parties to the adjudications, or which would substantially impair or impede the ability to protect the interests of the Class. Further, the claims of individual patients in the defined Class are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

## TOLLING, CONCEALMENT & ESTOPPEL

197. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

198. Defendant secretly incorporated Tracking Tools into its Website, providing no indication to users that their sensitive personal data, including their PHI and PII, would be disclosed to unauthorized third parties.

199. Defendant had exclusive knowledge that its Tracking Tools were incorporated on its Website yet failed to disclose that fact to customers and prospective customers or inform them that by interacting with its Website Plaintiffs' and Class Members' PHI and PII would be disclosed to third parties, such as Meta and Google.

200. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendant's conduct because the incorporation of Tracking Tools on Defendant's Website is highly technical and there were no disclosures or other indications that would inform a reasonable consumer that Defendant was disclosing and allowing Meta or Google to intercept PHI and PII.

201. The earliest Plaintiffs and Class Members could have known about Defendant's conduct was approximately in August of 2024, when they contacted the

undersigned counsel to discuss their potential claims against Defendant. Nevertheless, at all material times herein, Defendant falsely represented to Plaintiffs that their health information is not and will not be disclosed to any third party.

202. As alleged above, Defendant has a duty to disclose the nature and significance of its data disclosure practices but failed to do so. Defendant is therefore estopped from relying on any statute of limitations under the discovery rule.

## **LEGAL CLAIMS**

## **COUNT I**

### **Violation of the Electronic Communications Privacy Act**
### **18 U.S.C. § 2511(1)**
### ***(By Plaintiffs & on behalf of the Nationwide Class)***

203.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully set forth herein.

204.    The ECPA protects against intentional interception, attempted interception, or the procurement of another person to intercept or attempt to intercept any wire, oral, or electronic communication. *See* 18 U.S.C. § 2511(1)(a).

205.    The ECPA protects both sending and receipt of communications.

206.    The ECPA further provides any person who:

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.

Shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

*Id.* §§ 2511(1)(c) & (d).

207.   The primary purpose of the ECPA is to protect the privacy and security of communications as technology evolves.

208. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

209.   Section 2520 provides for $10,000 in statutory damages for violations of ECPA. *Id.* § 2520(c)(2)(B).

210.   The ECPA defines "intercept[ion]" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4).

211.   The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." *Id.* § 2510(8).

212.   "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." *Id*. § 2510(12).

213.    The transmissions of PII and PHI from Plaintiffs and Class Members to Defendant through Defendant's Web Properties are "electronic communications" under the ECPA. *See id*. § 2510(12).

214.    The PHI transmitted by Plaintiffs and Class Members include, but are not limited to, information regarding patient status, past and current health conditions and symptoms, treatments and care options, physicians, and other sensitive information.

215.    Furthermore, Defendant intercepted the "contents" of Plaintiffs' communications in at least the following forms:

    a.  The parties to the communications;

    b.  The precise text of patient search queries;

    c.  PII such as patients' IP addresses, Facebook IDs, browser fingerprints and other unique identifiers;

    d.  The precise text of patient communications about specific doctors;

    e.  The precise text of patient communications about specific medical conditions;

    f.  The precise text of information generated when patients requested or made appointments;

    g.  The precise text of patient communications about specific treatments;

    h.  The precise text of patient communications about scheduling appointments with medical providers;

    i.  The precise text of patient communications about billing and payment;

    j.  The precise text of specific buttons on Defendant's Website that patients click to exchange communications including Log-Ins, Registrations, Requests for Appointments, Search and other buttons;

k. The precise dates and times when patients click to Log-In on Defendant's Web Properties;

l. The precise dates and times when patients visit Defendant's Web Properties;

m. Information that is a general summary or informs third parties of the subject of communications that Defendant sends back to patients in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment and other information.

216. Additionally, through its use of the Tracking Tools, Defendant intercepted and disclosed the communications about patient status, health conditions and symptoms, and other PHI and PII Plaintiffs searched for on Defendant's Web Properties. This information was, in turn, used by third parties, such as Meta and Google, to (i) place Plaintiffs in specific health-related categories; and (ii) target Plaintiffs with advertising associated with Plaintiffs' particular health conditions. Defendant knowingly transmitted this data and did so for the purpose of financial gain.

217. "Electronic, mechanical or other device" means "any device or apparatus which can be used to intercept . . . electronic communication[s]." *Id.* § 2510(5).

218. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Allina Health, Meta, and Google use to track Plaintiffs' and Class Members' communications;

b. Plaintiffs' and Class Members' browsers;

c. Plaintiffs' and Class Members' computing devices

d. Defendant's web servers; and

e. The Meta Pixel and Tracking Tools deployed by Defendant to effectuate the sending and acquisition of patient communications.

219.   By embedding and deploying the Tracking Tools on Defendant's Web Properties, Defendant intentionally violated the ECPA, through its interception, attempt at interception, and its procurement of third parties to intercept the electronic communications of Plaintiffs and Class Members.

220.   Defendant also intentionally used or attempted to use the contents of Plaintiffs' and Class Members' electronic communications, knowing that the information was obtained through interception. Defendant's use of the intercepted information and data for its own advertising and data analytics, in the absence of express written consent, violated ECPA.

221.   Further, by embedding the Tracking Tools on its Web Properties and disclosing the content of patient communications relating to PHI and PII, without consent, Defendant had a purpose that was tortious, criminal, and designed to violate state and federal laws, including:

a.   An invasion of privacy;

b.   A violation of the Minnesota Uniform Deceptive Trade Practices Act, Mn. Stat. §325D.43-48;

c.   A violation of 42 U.S.C. § 1320d–6, the Administrative Simplification subtitle of HIPAA, which protects against the disclosure of individually identifiable health information to another person and is a criminal offense punishable by fine or imprisonment; and

d.   A violation of HIPAA.

222.   Any party exception in 18 U.S.C. § 2511(2)(d) does not apply. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3).

223.   42 U.S.C. § 1320d-6(a)(3) provides criminal and civil penalties against a healthcare provider who "knowingly . . . discloses individually identifiable health information to another person."

224.   HIPAA defines IIHI as:

any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) *relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual,* or the past, present, or future payment for the provision of health care to an individual, and—(i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[73]

225.   HIPAA prohibits disclosing patients' health information via tracking technologies. Defendant's use of the Tracking Tools violates HIPAA because the Meta Pixel and the other Tracking Tools transmit information that "identifies the individual" or, at a minimum, "there is a reasonable basis to believe that the information can be used to identify the individual," such as through unique identifying cookies and users' IP addresses.

---

[73] U.S.C. § 1320d(6) (emphasis added).

226.    Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:  used and caused to be used cookie identifiers associated with specific patients without patient authorization; and disclosed IIHI to Facebook without patient authorization.

227.    The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

228.    Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook source code was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

229.    As described above, Plaintiffs entered data on Defendant's Web Properties relating to health conditions and other PHI, and later received targeted advertisements from Allina Health. This shows that through the Tracking Tools employed, Defendant disclosed the IIHI of its Web Properties visitors to third parties in violation of the ECPA.

230.    Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in learning that:

    a.  Defendant intruded upon, intercepted, transmitted, shared, and used their PII and PHI (including information about medical symptoms, conditions, medical appointments, healthcare providers and locations, medications and treatments and health insurance and medical bills) for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

    b.  Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' PII and PHI without providing any value or benefit to Plaintiffs or Class Members;

    c.  Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' PII and PHI, such as understanding how people use its Web Properties and determining what ads people see on its Web Properties, without providing any value or benefit to Plaintiffs or Class Members;

    d.  Defendant failed to provide Plaintiffs and Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of its patient information and

    e.  The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, medical treatment and appointments that Plaintiffs and Class Members intended to remain private no longer private.

231.    Patients have the right to rely upon the promises that companies make to them. Defendant accomplished its tracking and retargeting through deceit and disregard, such that an actionable claim may be made, in that it was accomplished through source code that caused third-party Pixels and cookies (including but not limited to the _fbp, _ga and _gid cookies) and other tracking technologies to be deposited on Plaintiffs' and Class Members' computing devices as "first-party" cookies that are not blocked.

232.    Defendant's scheme or artifice to defraud in this action consists of:

    a.  the false and misleading statements and omissions in its privacy policy set forth above, including the statements and omissions recited in the claims below;

    b.  the placement of the 'fbp' cookie on patient computing devices disguised as a first-party cookie on Defendant's Website rather than a third-party cookie from Facebook and

    c.  the placement of the _ga and _gid cookies on consumer computing devices disguised as a first-party cookies on Defendant's Website rather than third-party cookies from Google.

233.    At no time did Plaintiffs or Class Members consent to Defendant's disclosure of their PHI and PII to Meta, Google, or other third parties. Plaintiffs and the Class had a

reasonable expectation that Defendant would not re-direct their communications content to Meta, Google, or others attached to their personal identifiers in the absence of their knowledge or consent.

234. Any purported consent that Defendant received was not valid.

235. Defendant has improperly profited from its invasion of Plaintiffs' and Class Members' privacy in its use of their data for its economic value.

236. Defendant knew that such conduct would be highly offensive. Regardless, it proceeded to embed the Tracking Tools and use them to the detriment of visitors to its Web Properties.

237. As a result of Defendant's violation of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages and attorney's fees and costs.

## COUNT II

**Violation of the Minnesota Wiretap Statute**
**Chapter 626A.02**
***(By Plaintiffs & on behalf of the Minnesota Subclass)***

238. Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully set forth herein.

239. The Minnesota Wiretap Statute, Minn. Stat. 626A, protects against intentional interception, attempted interception, or the procurement of another person to

intercept or attempt to intercept any wire, oral, or electronic communication. *See* Minn.

Stat. 626A.02, Subd. 1. 150.

240.   The Minnesota Wiretap Statute further provides any person who:

(2) intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when:

(i) such device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or
(ii) such device transmits communications by radio, or interferes with the transmission of such communication;

(3) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(4) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

Shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

Minn. Stat. 626A.02.

241.   Additionally, a person whose wire, oral, or electronic communication is

intercepted, disclosed, or intentionally used in violation of Chapter 626A may recover from

the person or entity that engaged in violation:

1. Temporary and other equitable or declaratory relief as may be appropriate;
2. Damages under subd. 3 …; and
3. A reasonable attorney's fee and other litigation costs reasonable incurred.

Minn. Stat. 626A.13, Subd. 2.

242. The transmission of Plaintiffs' and Minnesota Class Members' PHI and PII violates the Minnesota Wiretap Act.

243. The transmissions from Plaintiffs and Minnesota Class Members to Defendant, through Defendant's Web Properties are wire communications pursuant to Minn. Stat. 626A.01, Subd. 3.

244. "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Minn. Stat. 626A.01, Subd. 5.

245. "Contents" means "when used with respect to any wire, electronic, or oral communication, includes any information concerning the substance, purport, or meaning of that communication." Minn. Stat. 626A.01, Subd. 8.

246. "Electronic, mechanical or other device" means any device or apparatus which can be used to intercept a wire, electronic, or oral communication. Minn. Stat. 626A.01, Subd. 6.

247. Here, Plaintiffs' and Minnesota Class Members' browsers and computing devices and Defendant's webservers, website, and the Pixel code Defendant deployed are all "devices" for the purposes of the Minnesota Wiretap Statute.

248. "Electronic communication" means transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system but does not include:

(1) a wire or oral communication;

(2) a communication made through a tone-only paging device; or

(3) a communication from a tracking device, defined as an electronic or mechanical device which permits the tracking of the movement of a person or object.

Minn. Stat. 626A.01, Subd. 14.

249.  By employing and embedding the Pixel on Defendant's Web Properties, Defendant intentionally violated the Minnesota Wiretap Statute, through its interception, attempt at interception, and its procurement by Meta to intercept the electronic communications of Plaintiffs and the Minnesota Class members.

250.  Defendant willfully used or attempted to use the contents of Plaintiffs' and Minnesota Class Members' electronic communications, knowing that the information was obtained through interception.

251.  Defendant's use of the Pixel unlawfully and intentionally disclosed Plaintiffs' and Minnesota Class Members' PHI and PII to Meta, including but certainly not limited to, information regarding treatments, scheduling, locations, procedures, medical providers, and diagnosis. These intentional acts violate Minn. Stat. 626A.02.

252.  Defendant had no legitimate purpose for intentionally intercepting the contents of Plaintiffs' and Minnesota Class Members' private and personal electronic communications. Even if Defendant could identify some legitimate purpose, it would not outweigh the egregious breach and invasion of privacy Defendant has committed against Plaintiffs and Minnesota Class Members.

253.  At no time did Plaintiffs and Minnesota Class Members provide their consent to Defendant's disclosure of their PHI and PII to Meta or other third-parties.

254.    Defendant has improperly profited from its invasion of Plaintiffs' and Minnesota Class Members' privacy in its use of their data for its economic value.

255.    Plaintiffs and Minnesota Class members are entitled to damages, including compensatory and nominal damages in an amount to be proven at trial.

256.    Pursuant to Minn. Stat. 626A.13, Subd. 3, the Court may assess damages by: (i) the sum of three times the actual damages suffered by Plaintiffs and any profits made by the violator as a result of the violation; or (ii) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, whichever is greater of option (i) and option (ii).

257.    As a direct and proximate result of Defendant's conduct and pursuant to the Minnesota Wiretap Act, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; and reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT III

**Invasion of Privacy**
***(By Plaintiffs & on behalf of the Nationwide Class)***

258.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully set forth herein.

259.    The PHI and PII of Plaintiffs and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

260.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their PHI and PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

261.    Defendant owed a duty to Plaintiffs and Class Members to keep their PHI and PII confidential.

262.    Defendant's unauthorized disclosure of Plaintiffs' and Class Members' PHI and PII to Meta and Google, two of the largest advertising companies, is highly offensive to a reasonable person.

263.    Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' PHI and PII constitutes an intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

264.    Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy because Defendant facilitated Meta and Google's simultaneous collection and exploitation of confidential communications.

265.    Defendant failed to protect Plaintiffs' and Class Members' PHI and PII and acted knowingly when it installed the Tracking Tools onto its Web Properties because the purpose of the Tracking Tools is to track and disseminate individual's communications with the Web Properties for the purpose of marketing and advertising.

266.    Because Defendant intentionally and willfully incorporated the Pixel into its Web Properties and encouraged patients to use the Web Properties for healthcare purposes,

Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

267.    As a proximate result of Defendant's acts and omissions, the private and sensitive PHI and PII of Plaintiffs and Class Members was disclosed to a third party without authorization, causing Plaintiffs and the Class to suffer damages.

268.    Plaintiffs, on behalf of themselves and Class Members, seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest and costs.

269.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PHI and PII is still maintained by Defendant and still in the possession of Meta and Google and the wrongful disclosure of the information cannot be undone.

270.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential PHI and PII. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook who on information and belief continues to possess and utilize that information.

## COUNT IV

**Negligence**
***(By Plaintiffs & on behalf of the Nationwide Class)***

271.   Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

272.   Defendant required Plaintiffs and Class Members to submit non-public personal information in order to obtain healthcare services.

273.   Upon accepting, storing and controlling the PHI and PII of Plaintiffs and the Class, Defendant owed, and continues to owe, a duty to Plaintiffs and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive PHI and PII from disclosure to third parties.

274.   Medical providers have a duty to their patients to keep their PHI and PII completely confidential. *See* Minn. Stat. § 144.651 subd. 15-16; Minn. Stat. § 144.293.

275.   Defendant had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed.

276.   Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

277.   Some or all of the healthcare, medical, or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

278.   Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . .

practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

279.   Defendant's duty to use reasonable care in protecting confidential data also arose because Defendant is bound by industry standards to protect confidential PHI and PII.

280.   Defendant breached its duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PHI and PII from unauthorized disclosure.

281.   Plaintiffs and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Web Properties.

282.   Contrary to its duties as a medical provider, Defendant negligently installed the Tracking Tools to disclose and transmit to third parties Plaintiffs' and Class Members' communications with Defendant, including PHI and PII and the contents of such information.

283.   These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

284.   The third-party recipients included, but may not be limited to, Meta and Google.

285.   As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

a. PHI and PII that Plaintiffs and Class Members intended to remain private is no longer private;

b. Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. Plaintiffs and Class Members have suffered general and compensatory damages that were proximately caused by Defendant's negligence, in an amount to be determined by a jury;

e. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

f. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

g. Defendant's negligent actions diminished the value of Plaintiffs' and Class Members' PHI and PII; and

h. Defendant's breach of its duties as a medical provider was the proximate cause of Plaintiffs' and Class Members' injuries. But for Defendant's decision to install the invisible Tracking Tools on its Web Properties, Plaintiffs' and Class Members' PHI and PII would not have been shared without their consent with Meta and other unauthorized third parties.

286. Defendant's wrongful actions and inactions and the resulting unauthorized disclosure of Plaintiffs' and Class Members' PHI and PII constitutes negligence.

287. Plaintiffs and Class Members are entitled to compensatory, nominal, and punitive damages in an amount to be determined at trial.

## COUNT V

**Breach of Implied Contract**
**(*By Plaintiffs & on behalf of the Nationwide Class*)**

288.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

289.    As a condition of utilizing Defendant's Web Properties and receiving services from Defendant's healthcare facilities and professionals, Plaintiffs and Class Members provided their PHI and PII and compensation for their medical care.

290.    When Plaintiffs and Class Members provided their PHI and PII to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their PHI and PII without consent.

291.    Plaintiffs and Class Members would not have entrusted Defendant with their PHI and PII in the absence of an implied contract between them and Defendant obligating Defendant to not disclose PHI and PII without consent.

292.    The valid and enforceable contracts to provide medical and health care services that Plaintiffs and Class Members entered into with Defendant include Defendant's promise to protect nonpublic, PHI and PII given to Defendant or that Defendant gathers on their own from disclosure.

293.    Both the provision of medical services and the protection of Plaintiffs and Class Members' PHI and PII were material aspects of these contracts.

294.    Plaintiffs and Class Members would not have retained Defendant to provide healthcare services in the absence of an implied contract between them and Defendant obligating Defendant to not disclose PHI and PII without consent.

295.    A meeting of the minds occurred, as Plaintiffs and Class Members agreed to and did provide their PHI and PII to Defendant and paid for the provided healthcare in exchange for, amongst other things, the provision of healthcare and medical services and the protection of their PHI and PII.

296.    Plaintiffs and Class Members performed their obligations under the contract when they paid for their health care services and provided their PHI and PII.

297.    Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' PHI and PII without consent to third parties like Meta and Google.

298.    Defendant materially breached the terms of these contracts including, but not limited to, the terms stated in the relevant Privacy Policy. Defendant did not maintain the privacy of Plaintiffs' and Class Members' PHI and PII as evidenced by Defendant's sharing of that information with third parties such as Meta.

299.    As a result of Defendant's failure to fulfill the data privacy protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in the contracts. Plaintiffs and Class Members were damaged in an amount at least equal to the difference in the value of the healthcare with data privacy protection they paid for and the healthcare they received.

300.    Had Defendant disclosed that its data privacy was inadequate or that it did not adhere to industry-standard privacy measures, Plaintiffs and Class Members would not have purchased healthcare from Defendant.

301.    As a direct and proximate result of the disclosure of Plaintiffs' and Class Members' PHI and PII to Google and Meta, Plaintiffs and Class Members have been harmed and have suffered actual damages and injuries including without limitation the release and disclosure of their PHI and PII, the loss of control and diminution in value of their PHI and PII, the imminent risk of suffering additional damages in the future, disruption of their medical care and treatment, out-of-pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

302.    Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

### COUNT VI

**Unjust Enrichment**
***(By Plaintiffs & on behalf of the Nationwide Class)***

303.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

304.    Plaintiffs plead this claim in the alternative to their common law causes of action.

305.    Plaintiffs and Class Members conferred a benefit upon Defendant in the form of PHI and PII that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation. Defendant consciously collected and used this

information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

306. Defendant benefits from the use of Plaintiffs' and Class Members' PHI and PII and unjustly retained those benefits at their expense.

307. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

308. The benefits that Defendant derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members.

309. The services that Plaintiffs and Class Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide.

310. The medical services Defendant offers are available from other health care systems that protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs' and Class Members' PHI and PII without consent, neither Plaintiffs nor the Class Members would have purchased healthcare from Defendant.

311. By virtue of the unlawful, unfair, and deceptive conduct alleged herein, Defendant knowingly realized revenue from the use of Plaintiffs' and Class Members' PHI and PII for profit by way of targeted advertising related to their respective medical conditions and treatments sought.

312.     It would be inequitable under unjust enrichment principles in Minnesota and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

313.     Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## COUNT VII

### Minnesota Uniform Deceptive Trade Practices Act
### Mn. Stat. §325D.43-48
### *(By Plaintiffs & on behalf of the Minnesota Subclass)*

314.     Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

315.     The MUDTPA prohibits deceptive trade practices in a person's business, vocation, or occupation. *See* Minn. Stat. §325D.44, subd. 1.

316.     Defendant is subject to the rules and statutory requirements of Minn. Stat. §325D.44 because it advertised, offered, or sold goods or services in Minnesota and therefore engaged in business directly or indirectly affecting the people of Minnesota.

317.     Defendant violated Minn. Stat. §325D.44, including, but not limited to, the provisions where the person:

> represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; Minn. Stat. §325D.44, subd.1(5).

79

represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding. Minn. Stat. §325D.44, subd.1(7).

318. Defendant engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with consumer transactions, in violation of Sections Minn. Stat. § 325D.44, subd. 1(5) & (7).

319. Defendant's representations and omissions include both implicit and explicit representations through:

a. Failing to implement and maintain reasonable privacy measures to protect Plaintiffs' and the Minnesota Class's PHI and PII, which was a direct and proximate cause of the Privacy violations described herein;

b. Failing to identify and remediate foreseeable privacy risks and adequately maintain privacy measures despite knowing the risk of disclosure of patients' PHI and PII, which was a direct and proximate cause of the Privacy violations;

c. Failing to comply with common law and statutory duties pertaining to the privacy of Plaintiffs' and the Minnesota Class's PHI and PII, including duties imposed by the HIPAA, 45 C.F.R. § 160.102 and the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Privacy violations;

d. Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and the Minnesota Class's PHI and PII, including by implementing and maintaining reasonable privacy protection measures;

e. Misrepresenting that it would comply with common law and statutory duties pertaining to the privacy of Plaintiffs' and the Minnesota Class's PHI and PII, including duties imposed by the HIPAA, 45 C.F.R. § 160.10;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately protect Plaintiffs' and the Minnesota Class's PHI and PII; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and the Minnesota Class's PHI and PII, including duties imposed by HIPAA, 45 C.F.R. § 160.102 or the FTC Act, 15 U.S.C. § 45.

320.   Defendant's acts and practices were deceptive and unfair because Defendant knew its Web Properties contained the Pixel and Google tracking tools and also knew that the Pixel and Google tracking tools would be unknown or not easily discoverable by Plaintiffs and Class Members and that Defendant's actions caused or were likely to cause substantial injury to patients which was not reasonably avoidable by patients themselves and not outweighed by countervailing benefits to patients or to competition.

321.   The injury to patients from Defendant's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury and an unwarranted risk to the safety of their PHI and PII.

322.   Plaintiffs and the Minnesota Subclass could not have reasonably avoided injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of patient healthcare decision-making and information gathering.

323.   By withholding important information from patients about the inadequacy of its privacy protections and Defendant's intentional use of the Pixel and Google tracking tools on its Web Properties, Defendant created an asymmetry of information between it and patients that precluded patients from taking action to avoid or mitigate injury.

324.   Defendant also engaged in "deceptive" acts and practices in violation of

Minn. Stat. § 325D.44, including:

    a. Misrepresenting that the subject of a consumer transaction has performance, characteristics, or benefits it does not have which the supplier knows or should reasonably know it does not have; and

    b. Misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

325. Had Defendant disclosed to Plaintiffs and the Minnesota Subclass that it used the Pixel which publicly disclosed sensitive, medical information, Defendant would have been unable to continue this business practice and would have been forced to adopt reasonable data privacy measures and comply with the law.

326. Defendant was trusted with sensitive and valuable PII and PHI regarding millions of patients, including Plaintiffs and the Minnesota Subclass. Defendant accepted the responsibility of protecting the data while keeping the state of the tracking technologies used on its site and application secret from the public.

327. Plaintiffs and the Minnesota Subclass acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

328. Defendant had a duty to disclose the above-described facts due to the circumstances of this case, the sensitivity and extensivity of the PII and PHI in its possession and generally accepted professional standards.

329. This duty arose due to the representations and relationship between Defendant and Plaintiffs and the Minnesota Subclass as described herein.

330.    Defendant had exclusive or superior knowledge of the practices engaged in where private information related to health and safety was shared with third parties which Plaintiffs and the Minnesota Subclass had no reasonable manner of obtaining in advance, giving rise to a further duty to disclose.

331.    As a result of Defendant's wrongful conduct, Plaintiffs and the Minnesota Subclass were injured in that they never would have provided their PII and PHI to Defendant or purchased Defendant's services, had they known or been told that Defendant shared their PII and PHI with third parties.

332.    As a direct and proximate result of Defendant's violations of the MUDTPA, Plaintiffs and the Minnesota Subclass have suffered harm, including financial losses related to the payments or services made to Defendant that Plaintiffs and the Minnesota Subclass would not have made had they known of Defendant's inadequate data security; lost control over the value of their PII and PHI; and other harm resulting from the unauthorized use of their PII and PHI, entitling them to damages in an amount to be proven at trial.

333.    Plaintiffs and the Minnesota Subclass are at risk of future damage and harm from Defendant's deceptive and unfair practices because they are or may become patients of Defendant in the future and may have little choice but to continue to use Defendant's Web Properties to receive proper and complete medical care.

334.    Plaintiffs and the Minnesota Subclass seek all relief allowed by law, including reasonable attorneys' fees and costs and injunctive relief.

## COUNT VIII

### Violation of the Minnesota Consumer Fraud Act
### Minn. Stat. § 325F.69, *et seq*.
### *(By Plaintiffs & on behalf of the Minnesota Class)*

335.    Plaintiffs reallege and incorporate by reference every allegation contained in the paragraphs above as though fully stated herein.

336.    Defendant's practices were and are in violation of Minnesota's Consumer Fraud Act, Minnesota Statutes § 325F.69, *et seq*.

337.    Defendant is a person as defined by Minnesota Statute § 325F.68, subd. 3.

338.    The medical services that Defendant markets, provides, offers, and sells are considered merchandise. Minnesota Statute §325F.69, Subd. 2.

339.    Defendant engaged in deceptive acts and practices in the form of misrepresentations and omissions while conducting business throughout Minnesota to thousands of individuals seeking medical care.

340.    Specifically, Defendant represented that it lawfully and in accordance with healthcare standard practices, protected the confidentiality and privacy of its patients and omitted material information regarding its use of Meta Pixel and Tracking Tools on its Website to the public at large.

341.    Defendant did not protect the confidentiality or privacy of its patients when it used the Meta Pixel and Tracking Tools on its Web Properties.

342.    Defendant did not disclose its use of the Meta Pixel and Tracking Tools on its Web Properties or that it shared private, sensitive patient data with third-parties, such as Meta and Google, without patients' consent.

343.   Defendant's failure to inform patients or potential patients of its use of the Meta Pixel and Tracking Tools on its Web Properties and its disclosure of patient and website visitors' data to third parties was likely to, and did, deceive Plaintiffs and Minnesota Subclass Members.

344.   As a direct result of Defendant's unlawful deceptive practices, Plaintiffs and the Minnesota Subclass suffered injuries including the loss of their personal, private data.

345.   Plaintiffs and the Minnesota Subclass seek an award of damages for violations of Minn. Stat. § 325.69 pursuant to Minn. Stat. § 8.31, subd. 3a and all other appropriate relief.

## COUNT IX

### VIOLATION OF THE MINNESOTA HEALTH RECORDS ACT
### Minn. Stat. §144.291, *et seq.*
### *(On behalf of Plaintiffs & the Minnesota Subclass)*

346. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

347. The Minnesota Health Records Act (the "MHRA") prohibits the release of patient "health records" absent signed consent. *See* Minn. Stat. § 144.293.

348. The MHRA defines "health record" broadly to include "***any information***, whether oral or recorded in any form or medium that ***relates to*** the past, present, or future physical or mental health or condition of a patient; the provision of healthcare to a patient; or the past, present, or future payment of provision of healthcare to a patient." Minn. Stat. § 144.291, subd. 2(c) (emphasis added).

349. The PHI of Plaintiffs and Minnesota Subclass Members that was surreptitiously recorded and transmitted to Meta via Defendant's Pixel and CAPI falls within the definition of "Health Records" as that term is defined by the MHRA.

350. Plaintiffs and Minnesota Subclass Members are "patients" as that term is defined under the MHRA at all times relevant under Minn. Stat. §144.291, subd. 2(g).

351. Under the MHRA, it is unlawful for a third party to access a patient's health records from a provider, or a person who receives records from a provider, without the patient or the patient's legally authorized representative's consent, specific authorization in law, or a representative from a provider that holds a signed and dated consent from the patient authorizing the release. Minn. Sta. §144.293, subd. 2(1-3).

352. Through the Pixel and other third-party tracking technologies, Defendant released Plaintiffs' and Minnesota Subclass Members' health records to Meta and Google including, but not limited to, their specific medical conditions, treatments, and providers sought, as detailed herein.

353. Neither Plaintiffs nor Minnesota Subclass Members consented to have their records released via the Pixel or other Tracking Tools.

354. Defendant's installation of the Pixel and other third-party trackers on its Website constitutes an "affirmative" release under Minnesota law. *See Larson v. Nw. Mut. Ins. Co.*, 855 N.W.2d 293, 302 (Minn. 2014).

355. Under the MHRA, a provider or other person who causes an unauthorized release of a health record by negligently or intentionally releasing the health record is

liable to the patient for compensatory damages, plus costs and reasonable attorneys' fees. Minn. Stat. §144.298, subd. 2.

356. Plaintiffs have suffered compensatory damage including, but not limited to, invasion of their privacy, loss of value of their PHI, directed harassing and spam Facebook advertisements, and the mental and emotional anguish caused by Defendant's surreptitious recording and transmittal of their PHI, including medical diagnoses, to Facebook.

357. As a result of Defendant's violations of the MHRA, Plaintiffs and Minnesota Subclass Members seek all damages authorized by law, including compensatory damages, costs, and attorneys' fees.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment in their favor as follows:

a.  Certification of the Class pursuant to the provisions of Fed. R. Civ. P. 23 and an order that notice be provided to all Class Members;

b.  Designation of Plaintiffs as representatives of the Class and the undersigned counsel as Class Counsel;

c.  An award of damages in an amount to be determined at trial or by this Court;

d.  Declaring that Defendant's past conduct was unlawful, as alleged herein;

e.  Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

f.      Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

g.      Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and disgorgement of profits unlawfully obtained;

h.      Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest;

i.      Awarding Plaintiffs and Class Members reasonable attorneys' fees, costs, and expenses; and

j.      Granting such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs, on behalf of themselves and the Class, demand a trial by jury of any and all issues in this action so triable of right.

Dated: September 13, 2024                  Respectfully submitted,

_s/ Christiaan A. van Lierop_
Christiaan A. van Lierop (MN Bar No. 0402854)
**JOHNSON BECKER, PLLC**
444 Cedar Street, Suite 1800
St. Paul, MN 55101
T: 612-436-1818
E: cvanlierop@johnsonbecker.com

David S. Almeida*
Britany A. Kabakov*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Avenue
Chicago, Illinois 60614

T: (312) 576-3024
E: david@almeidalawgroup.com
britany@almeidalawgroup.com

*Pro Hac Vice applications to be submitted*

*Attorneys for Plaintiffs & the Putative Class*